**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

In re:                                    )        4:03-cv-0004
                                          )
CONSOLIDATED INDUSTRIES                   )        (Reference Withdrawn from the
CORP.,                                    )        United States Bankruptcy Court for the
                                          )        Northern District of Indiana, Case
          Debtor.                         )        No. 98-40533)

**OPINION AND ORDER**

This matter is before the Court on the Motion to Approve Class Action Settlement

Agreement filed by Trustee Daniel L. Freeland on July 26, 2007.  (DE 22.)  The issues have been

fully briefed; for the reasons set forth below, the Trustee's Motion is **GRANTED**.


**I.      Background:**

In the Motion to Approve Class Action Settlement Agreement (DE 22), the Trustee moved

this Court to authorize him to enter into a Class Action Settlement Agreement and Confidential

Settlement Funding Agreement with Mike Stefanyshyn and other plaintiffs who sued Consolidated

Industries in a class action in state court.  (DE 22.)  Judge Allen Sharp[1] set a hearing on the motion

for August 31, 2007.  On August 6, 2007, Enodis Corporation moved to adjourn the hearing and

objected to the Trustee's motion to authorize the settlement. Enodis argued that the settlement is not

fair to the creditors and is not in the best interest of Consolidated Industries. Moreover, Enodis asked

the Court  to delay the hearing until the United States Court of Appeals for the Seventh Circuit

---

[1]At the time the Motion to Approve Class Action Settlement Agreement was filed, Judge Sharp
was the presiding judge in this case.  The case was transferred from Judge Sharp to the
undersigned on August 20, 2007.

1

decides if Enodis is a proper creditor of Consolidated Industries. (The bankruptcy court held that it was not).  On August 17, 2007, Robinson & Cole, LLP, one of the creditors of Consolidated Industries, also objected to the Trustee's motion on the basis that, without additional discovery, it was impossible to ascertain the merits of the settlement.  And on August 20, 2007, another creditor of Consolidated Industries, Bard Manufacturing, filed its objection against the class settlement, arguing that it should be allowed to conduct limited discovery to determine if the proposed settlement is fair and equitable to the creditors and represents sound business judgment by the Trustee.

The Court held a status conference on August 27, 2007, in which all parties participated.  On October 15, 2007, the Court issued an Order. (DE 62.)  Because Enodis conceded at the hearing that it had no standing to object to the Trustee's motion, the Court disregarded Enodis's objections. Finding that there was no compelling reason to delay the hearing on settlement until after Enodis's claims are resolved by the Seventh Circuit, the Court denied Enodis's motion to adjourn (DE 27). The Court then allowed Bard Manufacturing Company and Robinson and Cole to conduct limited discovery on the terms of the settlement, stating that discovery was to be concluded by December 14, 2007.  (DE 62 at 2.).

On January 11, 2008, the Court held a telephonic status conference.  The parties were directed to file any objections to class claims by February 27, 2008.  On March 27, 2008, and March 28, 2008, the Court held evidentiary motion hearings on the Trustee's Motion to Approve Class Action Settlement Agreement and for other Relief.  At the close of those hearings, the Court gave the parties additional time to file supplemental briefs and proposed findings of fact. The Trustee and

Mike Stefanyshyn filed proposed findings of fact on May 19, 2008.  (DE 81, 82.)  Robinson and Cole filed a brief in support of the motion to adjourn (DE 27) on May 19, 2008.  (DE 83.)

## II.   Findings of Fact:

1.     On May 28, 1998, Consolidated Industries Corporation filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.  (*See In re Consolidated Indus. Corp.*, 98-40533, Doc. No. 1 (hereinafter "Bankr. Doc.").)

2.     Following the filing of Consolidated's chapter 11 petition, on March 1, 2000, the Trustee was appointed as the chapter 11 trustee of Consolidated's bankruptcy estate.  (Bankr. Doc. 625).  Shortly before his appointment, Consolidated stopped manufacturing furnaces and ceased its operations.  On August 11, 2000, the case was converted to a chapter 7 case and the Trustee was re-appointed as the interim chapter 7 trustee.  (Bankr. Doc. 790).  On September 8, 2000, the Trustee conducted a first meeting of creditors in the chapter 7 case.  (Bankr. Doc. 798).  No creditor requested an election of a trustee so at the conclusion of the meeting the Trustee became the permanent chapter 7 Trustee.  11 U.S.C. § 702(d).

3.     Before it filed for bankruptcy, Consolidated was in the business of manufacturing furnaces for use in residential homes.  (Trustee's Exhibit ("TX") 116 at 9.)  Most of the furnaces that Consolidated manufactured were what is known as horizontal furnaces, furnaces that are installed horizontally typically in tight spaces in attics or crawlspaces.  (*Id*. at 9-10).  Consolidated marketed these furnaces under several designations including the "H" series and "G" series furnaces,  along with several other miscellaneous lines of furnaces.  (3/27/08 Tr. at 57–58). Consolidated's primary product, however, was the "H" series furnace.  (*Id*.).

4.      During the 1980s and 1990s, Consolidated manufactured approximately one million residential furnaces which were sold throughout the United States to furnace wholesalers, dealers, installers, residential developers and original equipment manufacturers, such as Bard, Amana and Trane ("Distributors").  (*See, e.g.*, TXs 8, 9, 12, 16, 19, 23, 24, 25, 26, 30, 37, 44, 49, 58, 63, 66, 91, 97, 116 at 11–13, 137,179; 3/27/08 Tr. at 57–58.)

5.      Up through January 1998, Consolidated was owned by Welbilt Corporation n/k/a Enodis Corporation.  From 1989 through January, 1998, Welbilt took over $38 million of cash and asset value from Consolidated.  During this same time period, consumers began to experience problems with Consolidated's furnaces and filed numerous lawsuits including two class actions against Consolidated.  Distributors and developers that purchased Consolidated's furnaces made substantial warranty claims and filed lawsuits against Consolidated.  Ultimately, the fact that Welbilt stripped Consolidated of all of its capital coupled with the furnace-related liability claims led to Consolidated's bankruptcy filing.  *See Freeland v. Enodis Corp.*, 2006 U.S. Dist. LEXIS 79620 at *2–6 (N.D. Ind. 2006).

6.      In its bankruptcy proceedings, Consolidated's creditors mainly consist of its former employees, its suppliers and various entities and persons, including Distributors, that are asserting breach of warranty, property damage and personal injury claims based upon defects in the Debtor's furnaces.  (*See generally*, Claims Docket in Case 98-04553; *see also* TXs 169, 170).

7.      One of the largest unresolved furnace-related proofs of claim is a claim filed by Mike Stefanyshyn and certain other plaintiffs on behalf of themselves and similarly-situated plaintiffs (the "Settlement Class").  (TX 5).  The plaintiffs filed their claim in the amount of $1 billion on behalf of themselves and all similarly-situated persons (the "Settlement Class Proof of

4

Claim"). Before the bankruptcy case began, on December 17, 1997, the plaintiffs had filed suit against Consolidated in state court in Tippecanoe County, Indiana, which case was docketed as Cause No. 79 D 01-9712-CT-59. (*Id*.). In this State Court Action, the plaintiffs allege that Consolidated manufactured defective furnaces which caused property damage, bodily injury and/or personal injury, and they seek nation-wide class certification for their claims and damages in excess of $1 billion. (*See* TX 6). The allegations made in the State Court Action also are the basis for the Settlement Class Proof of Claim. (TX 5.)

8.     The litigation over the merits of the Settlement Class Proof of Claim has largely occurred in state court. On February 20, 2002, the Bankruptcy Court granted the Settlement Class relief from the automatic stay so that the Settlement Class could liquidate its claims against the Debtor in the State Court Action. (Bankr. Doc. No. 1274).

9.     Thereafter, Welbilt objected to the Settlement Class Claim solely on the grounds that a nationwide class should not be certified. (Docket No. 3). The Settlement Class moved the Bankruptcy Court to abstain from hearing this objection. On January 10, 2003, the Banrkuptcy Court transferred the objection and the motion to abstain to this Court because it found that under 28 U.S.C. § 157(b)(2)(B) it lacked jurisdiction to determine the allowance of a claim that involved unliquidated personal injury damages. (Docket No. 12.) On April 2, 2003, this Court accepted the transfer and granted the motion to abstain, holding that "[i]t would appear that this action would be better served by allowing the state court to adjudicate the class issue." (Docket No. 14..

10.     The Trustee is represented in the State Court Action by Jeffrey Richardson, a partner with the firm of Mitchell Silberberg & Knupp LLP. (3/27/08 Tr. at 37.) Mr. Richardson spends 90% of his professional time defending parties in class action litigation and of this time, 30% to 40% is

spent in the defense of class action litigation involving products liability claims.  (*Id*. at 37--38.. Since 2001, Mr. Richardson has defended the Trustee in six different actions pending against Consolidated where stay relief was granted including one other class action case.  (*Id*. at 38--39.)

11.     Since 2001, Mr. Richardson has spent several thousand hours defending the estate in the various matters he has handled for the Trustee and has spent over a thousand hours alone on the defense of the estate in the State Court Action.  (*Id*. at 39--40).  The things that he did to defend the estate against the claims asserted in the State Court Action, included:  (a) visiting Lafayette, Indiana on multiple occassions to review all of Consolidated's business and engineering records; (b) interviewing the attorneys who had represented Consolidated or its insurers in prior litigation related to the furnaces and reviewing their files; (c) interviewing Consolidated's employees about the furnaces, some on multiple ocassions, including Dick Weber (president), Richard Ray (service employee), Dick Hutchinson (president), Bill Hall (president), Gerry Gable (engineer), and Don Hussong (engineer); (d) reviewing documents produced in discovery in the prior cases and in the State Court Action; (e) attending depositions and reviewing transcripts of depositions conducted in other cases; (f) spending substantial time discussing the case with the Settlement Class's counsel and reviewing their summaries of their case and its strengths (TX 137); and (g) taking discovery of the named plaintiffs in the State Court Action.  (3/27/08 Tr. at 40--44; 46--47.)

12.     Mr. Richardson also has spent substantial time interviewing potential experts for Consolidatied from Harvard, MIT, Purdue, Stanford, Ohio State, the Illinois Institute of Technology and the University of Illinois at Urbana Champaign and from private industry.  (*Id*. at 45).

13.     Mr. Richardson also reviewed deposition transcripts and reports prepared by Gerald Zaminski, an expert hired by the Settlement Class, who also has served as an expert in other cases

against Consolidated and wrote a report about the furnaces for the Consumer Products Safety Commission.  (*Id.* at 45).  Mr. Zaminski has been involved in litigation involving Consolidated's furnaces for ten years and, according to Mr. Richardson, has inspected more of the Consolidated furnaces for defects than anyone else other than Consolidated employees.  (*Id.*).

14.     Mr. Richardson performed all of this work before the Trustee reached an agreement to settle the Settlement Class Proof of Claim and the State Court Action.  (*Id.* at 45-46).

15.     Mr. Richardson also represented the Trustee in the negotiations to resolve the Settlement Class Proof of Claim and the State Court Action.  (*Id.* at 44.)

16.     The Trustee and the Settlement Class began formal mediation in 2003 supervised by Lester Levy, a well-respected mediator with Judicial and Mediations Services.  (*Id.* at 48-49).  Prior to that time, the Settlement Class had participated in formal and informal discussions with Consolidated, which first began before the Trustee's appointment.  (*Id.* at 136).  The first formal mediation session with the Trustee was an all-day session in Chicago where Mr. Zaminski made a full presentation to the Trustee and his counsel. (*Id.* at 48–49.)  A second live meeting also was held in 2003.  (*Id.* at 49.)

17.     Mr. Richardson testified that the parties were very far apart when the mediation process began in 2003. (*Id.*). Although Consolidated's insurance companies participated in the initial mediation sessions, they were unwilling to pay the entire settlement demand. (*Id.* at 50, 69–70).[2]  The

---

[2] The Insurers are National Union Fire Insurance Company of Pittsburgh, PA, Travelers, ACE Insurers, North River Insurance Company, United States Fire Insurance Company, Royal Indemnity Company, American National Fire Insurance Company, TIG Insurance Company and AIU Insurance Company.  (TX 2).

Consolidated bankruptcy estate had no money to pay the claim in 2003 because it had not yet obtained its judgment against Welbilt. (3/27/08 Tr. at 170–71.)

18.     Consolidated's Insurers were unwilling to fund the entire settlement for several reasons. First, the Settlement Class's claims included claims for breach of warranty and fraud and the Insurers were not obligated to cover warranty or fraud claims or the cost to repair or replace the furnaces. *Freeland v. Enodis*, 2006 U.S. Dist. LEXIS 79620, at *17 (N.D. Ind. October 31, 2006). The Insurers also contended that the self-insured retention for each claim related to each furnace was $250,000, a position with which the Bankruptcy Court had agreed in a written opinion. *Freeland v. Wausau Ins. Co.*, 98-4259, slip op. (Bankr. N.D. Ind. Sept. 4, 2002) (admitted as TX 153; *see also* 3/27/08 Tr. at 69-70).[3] As a result, for all practical purposes, Consolidated may have had little or no insurance to cover the claims made in the State Court Action because the damages related to any one furnace are unlikely to exceed $250,000. (*Id.*). These problems with coverage also created a possibility that the Insurers might not continue to pay defense costs.

19.     Because of the Insurers' positions with respect to settlement and the fact that the Trustee had no money in the estate when these talks began, the Trustee, the Insurers, and the Settlement Class agreed to postpone further mediation until after the Bankruptcy Court decided the Trustee's lawsuit against Welbilt. (*Id.* at 49–51.)

20.     The lawsuit against Welbilt is the only significant asset of the Consolidated estate. After his appointment, the Trustee continued the prosecution of a lawsuit against Welbilt seeking the recovery of money that Welbilt took from Consolidated between 1988 and 1998 and seeking

---

[3] The Trustee has appealed that decision and the appeal is pending in this Court. *Freeland, Trustee v. TIG Insurance Company, et al.,* Civil No. 4:03-cv-0017. It has been stayed by agreement with the Insurers. (*See Id.* at DE 17).

other relief including a declaration that Welbilt was the alter ego of Consolidated and responsible for all of its debts (the "Welbilt Litigation"). In December 2002 and July 2004, this Court and the Bankruptcy Court entered judgments in favor of the Trustee and against Welbilt on the fraudulent transfer claims. Those judgments total approximately $54,000,000. *See Freeland v. Enodis*, 99-4022, Decision and Proposed Findings of Fact and Conclusions of Law at p. 23 (July 28, 2004) (Bankr. Ct. Doc. 622); *Freeland v. Enodis*, 292 B.R. 354 (N.D. Ind. 2002). The judgments are currently on appeal in the United States Court of Appeals for the Seventh Circuit.

21. After the Bankruptcy Court ruled in the Trustee's favor in the Welbilt Litigation, the Trustee, the Insurers and the Settlement Class again agreed to defer discussions pending the appeal of the Bankruptcy Court's judgment to the District Court. (3/27/08 Tr. at 49–50.)

22. After this Court affirmed the judgment against Welbilt in October, 2006, the Settlement Class insisted that the formal mediation process resume. (*Id.* at 50– 51.)

23. Between December 2006 and March 2007, the Trustee and the Settlement Class participated in five in-person mediation sessions and the Insurers participated in three of these sessions. (*Id.* at 51–52). All of the participants in these mediation sessions who testified at the hearing on the Motion—the Trustee, Mr. Richardson and John Crabtree, one of the attorneys for the Settlement Class— described the mediation process as arms-length and at times arduous and difficult. (*Id.* at 129, 144, 163). No contrary evidence was presented on this point.

24. The parties reached a tentative agreement at the March 2007 mediation session and then spent three months negotiating the two documents that memorialize the agreement, a Class Settlement Agreement and a Confidential Settlement Funding Agreement and Release (collectively, the "Settlement"). (TXs 1, 2; 3/27/08 Tr. at 53). The Class Settlement Agreement was executed

on July 2, 2007, and the Confidential Settlement Funding Agreement was executed on July 12, 2007. (*Id*.).

25.      Under the terms of the Class Settlement Agreement (TX 1), the Trustee, the Settlement Class, and the Insurers have agreed to resolve all of the Settlement Class's claims arising out of the defective furnaces, including the Settlement Class Proof of Claim and the State Court Action, on the following terms and conditions:

- The Settlement Class shall include all Persons who were, are or become Owners of "G" series and "H" series furnaces manufactured by Consolidated at any time, as well as all other series and models of furnaces manufactured by Consolidated between December 17, 1985 and 2001 (collectively, the "Furnaces") and/or who have asserted, or could assert, claims in any way arising out of or relating to such Furnaces, and all subrogees, assignees, successors, and other Persons or Representatives, as such terms are defined in the Settlement Agreement, who have asserted or could assert any such claims by, through or on behalf of such past, current and future Owners and/or residents and occupants of Residences. The Settlement Class is broadly defined to allow Developers and distributors who, among other things, replaced or paid for the replacement of a furnace at no cost to the owner of the residence that contained a furnace and/or who had or have any claims against Consolidated arising out of the Furnaces to an to assert their claims through Settlement.

- The Trustee, the Settlement Class and the Insurers will establish a Settlement Fund to be administered by an administrator to be appointed.  The Settlement Administrator will provide notice to the Settlement Class of the claims procedures and opt out procedures set forth in the Class Settlement Agreement.

- The Insurers will contribute $4.8 million into the Settlement Fund in settlement of the Settlement Class's strict products liability and negligence claims.

- The Trustee will agree to the allowance of the Settlement Class Proof of Claim in the amended amount of $47 million in settlement of the Settlement Class's warranty and fraud claims.  Any recovery on account of the Settlement Class Proof of Claim will be deposited into the Settlement Fund.

- The Trustee will execute a mutually-agreeable stipulated judgment against the Debtor in the amount of $51.8 million.

- The Releasing Parties, who consist of the Settlement Class and their members, agents, Representatives, partners, joint venturers, affiliates, attorneys, predecessors,

successors, heirs, assigns, insurers, and all past, present and future Owners of Furnaces, and any other Persons or Entities claiming through the Settlement Class, shall release the Released Parties from all Settled Claims.   The Released Parties are the Consolidated bankruptcy estate, the Trustee and any successor trustee, William Hall, Consolidated's attorneys of record in the Action and in the Bankruptcy Case, the Insurers and successors of the Insurers (but only in their capacity as Insurers), Furnace wholesalers, distributors, dealers, and installers (in their capacities as such) and developers of Residences (in their capacities as such).   The Released Parties expressly do not include Welbilt or the other defendants in the Trustee's lawsuit against Welbilt. The Releasing Parties shall assign to the Trustee any and all rights such Releasing Parties may have against all Persons other than Released Parties relating to or arising out of the Furnaces.

(TX 1; 3/27/08 Tr. at 53–56).

26.     Under the terms of the Confidential Settlement Funding Agreement and Release (TX 2), the Trustee and the Insurers have agreed to create a joint settlement fund that will fund the potential benefits under the Settlement Agreement on certain terms and conditions set forth therein. The Funding Agreement further provides that Consolidated shall release the Insurers for the settled Class claims.  (TX 2).  Assuming that there are not significant opt-outs from the Class, it is likely that the appeal pending in this Court from the Bankruptcy Court's orders denying insurance coverage can be dismissed.  (3/27/08 Tr. at 169).

27.     Mr. Richardson testified that it is likely that more than $1 million from the Insurer's contribution would be spent on the class notice program.  (3/27/08 Tr. at 54–55; 107).  The balance of the Insurer's contribution will pay for property damage, certain administration expenses, and up to $1.33 million in attorney's fees and costs.  Subject to the attorney's fees and costs awarded by the State Court, 2.5% of the contribution by the estate will pay for additional administration expenses and the balance will be divided equally: (a) to pay for the cost of inspections for Furnace owners; (b) to provide payments to Furnace owners who had already replaced their defective Furnace; and (c) to pay for the cost of replacing Furnaces found to be defective.  (*Id*. at 154–55).

11

28.     On July 5, 2007, the State Court entered an Order Granting Certification of Proposed Settlement Class and Granting Preliminary Approval of the Proposed Settlement.  (TX 3).

29.     Following the entry of the State Court's preliminary approval of the Settlement, on July 26, 2007, the Trustee filed a Motion to Approve the Settlement with this Court and also moved to have this Court approve the form of notice to be sent to all creditors.  (Docket Nos. 21, 22).  The Trustee moved for approval of the Settlement in the District Court, as opposed to the Bankruptcy Court, because the Settlement Class Proof of Claim involves the settlement of personal injury claims and thus jurisdiction over this aspect of the chapter 7 case rests exclusively in the District Court.  28 U.S.C. § 157(b)(5).  That same day, the District Court entered an Order approving the form of notice and setting August 20, 2007, as the date by which all objections to the Settlement were due.  (Docket No. 23).  On July 27, 2007, the Trustee filed his Certificate of Service certifying that Notice of the Settlement was given to all creditors and other parties in interest in accordance with this Court's July 26, 2007, Order.  (DE 24).  The notice of Trustee's Motion included the terms of the Settlement. (*Id.*).  The Court finds that creditors and interested parties were given an adequate opportunity to object to the Settlement.

30.     Out of the 1695 creditors who received notice, only three filed any sort of objection to the Settlement and one of those objecting parties, Welbilt, was subsequently found to have no standing to do so.  (Docket Nos. 27, 36, 39, 62).  In addition, one furnace owner, Shelley Whitney, responded to the Court with a letter that urged that her claim be paid quickly, stating, in part:

> I have been part of this class action suit for over two years, I have yet to see any motion to pay funds for the furnace that is in my home that was made by Consolidated Industries.  I do not want a fatality to happen before I get granted for funds to replace my furnace.  It is a fact that the furnace made by Consolidated Industries has problems

> please hear my pled (sic) and grant other people who have a (sic)
> interest in this class action suit gratification also before the funds are
> all gone.

(Docket No. 37).  Ms. Whitney's letter appears to be in support of the Settlement.

31.     One of Consolidated's Distributors, Bard Manufacturing Company, also filed an objection (Docket No. 39) but withdrew its objection (Docket No. 71) based upon the Trustee's agreement to read certain stipulations into the record regarding Bard's treatment under the Settlement.  (3/27/08 Tr. at 5–9).

32.     Prior to the hearing on the Trustee's Motion, on October 15, 2007, this Court found that Welbilt lacked standing to object to the Settlement because it owes the Trustee $54 million and has not paid that amount.  (Docket No. 62).  The Court declined to continue the hearing, but did allow the remaining objectors to take discovery.  (*Id*.).

33.     Eric Daniels, the managing partner of Robinson & Cole (3/28/08 Tr. at 190), testified that his firm submitted bills to Welbilt for the time his firm spent in objecting to the settlement and that Welbilt has paid those bills.  (*Id*. at 260).  In addition, Robinson & Cole's counsel, Baker & Daniels, who also represent Welbilt, have submitted their bills directly to Welbilt for payment of the time spent representing Robinson & Cole.  (*Id*. at 261-64; *see also* TXs 4, 167).  Mr. Daniels testified that Welbilt is one of his most important clients and that he testified on their behalf against the Trustee in the Welbilt Litigation even though his testimony hurt his firm's ability to collect on its claim against Consolidated.  (*Id*. at 219–221).[4]  Mr. Daniels acknowledged that the amount spent

---

[4] Mr. Daniels claimed not to know that the Trustee's only significant asset is the judgment against Welbilt and that testifying against the Trustee in that case hurt his firm's chances of recovery but such testimony is not credible given the attorney-client relationship between Welbilt and Mr. Daniels.  (3/28/08 Tr. at 221).

to prosecute his firm's objection to the Settlement exceeded the approximately $21,000 owed to Robinson & Cole.  (*Id*. at 264–65).  He further testified that his discussions with Welbilt about his firm's actions in objecting to the Settlement were subject to an attorney-client privilege, and thus effectively testified that the objection his firm filed was on behalf of its client Welbilt.  (*Id*. at 217). [5]

34.     Three witnesses testified on behalf of the Settlement -- Mr. Richardson, Mr. Crabtree and the Trustee.  (*See generally* 3/27/08 Tr.).  Robinson & Cole called Mr. Daniels to testify against the Settlement. (*See generally* 3/28/08 Tr.).

35.     Mr. Richardson testified about the likelihood of a finding of liability against Consolidated, the amount of a likely damage award, the benefits of the settlement arising from the certification of a nationwide settlement class and the delay that would be caused by further litigation. (3/27/08 Tr. at 52, 56–74).  Mr. Richardson testified that in his opinion the Settlement was fair and reasonable and within the reasonable range of litigation possibilities.  (*Id*. at 56, 131).

36.     With respect to Consolidated's liability in the State Court Action, Mr. Richardson testified that in his opinion the probability was at least 75% that a jury would find Consolidated's Furnaces to be defective and that for certain of the Furnaces, the probability of a finding of liability was much higher.  (*Id*. at 74).  The Trustee testified that he believed the likelihood of a finding of liability against Consolidated was almost certain, testifying that "[m]y opinion is that it is 99 percent that [Consolidated] would be liable."  (*Id.* at 163).

---

[5] Specifically, when he was asked how it was determined that Welbilt would pay Robinson & Cole's fees, Mr. Daniels responded that he "can't answer that without divulging client privileged information.  It would necessarily get into conversations I had with my client." (3/28/08 Tr. at 217). When he was asked who was his client, Mr. Daniels testified that it was "Enodis."  (*Id*.).

37.    The primary Furnaces at issue are the "H" series or horizontal Furnaces.  (TX 179;
3/27/08 Tr. at 57–58).  The basic components of a horizontal Furnace are the blower, the burner and
the heat exchanger.  (*Id*. at 59–60).  The blower brings cool circulation air from the house and blows
it through the heat exchanger and then back out into the house as warm air.  (*Id*. at 59).  The burner
sits below the heat exchanger with a series of burner ports and multiple flames that heat the heat
exchanger.  (*Id*. at 59–60).  The heat of the heat exchanger is transferred to the air passing through
it.  (*Id*. at 60–61).  The expansion joints hold the heat exchanger in place and contract and expand
due to the warming and cooling as the furnace cycles on and off in an attempt to maintain a steady
household temperature.  (*Id*.).

38.    According to Mr. Richardson, Consolidated's Furnaces suffered from three major
defects: (1) defects in the design of the expansion joints that made the expansion joints insufficient
to withstand cyclical pressures as the furnaces heated and cooled and which caused cracking in the
expansion joint; (2) defects in the manufacturing of the heat exchangers that led to weld seam and
other failures; and (3) defects in the manufacturing process that undermined the ability of the burner
ports to withstand heat and caused deterioration.  (*Id*. at 59-62).  In addition, miscellaneous problems
also existed with certain batches of the furnaces, such as those manufactured with an oversized
orifice.  (*Id*. at 62).   According to Mr. Richardson, these problems existed in both NOx and non-
NOx rod furnaces.  (*Id*.).

39.    Mr. Richardson concluded that it was likely that a jury would find the Furnaces were
defective because of the strength of the expert testimony against Consolidated and the fact that
Consolidated's employees would testify that the Furnaces were defective.  (*Id*. at 74).  In addition,
in 1992, an outside engineering firm, Arthur D. Little, had concluded that the Furnaces were

15

defective and recommended design changes.  (TX 23).  Mr. Richardson's opinion, which was shared

by the Trustee, was that Consolidated would most likely stipulate to liability if the case were tried

to avoid inflaming the jury and increasing the likelihood of a punitive damage award.  (3/27/08 Tr.

at 74-75, 164).  The Trustee recounted particularly troubling testimony given by Welbilt's general

counsel during the Welbilt Litigation that Welbilt knew the Furnaces caused fires but that Welbilt

and Consolidated believed that the fires would not be severe because a fire would burn out the

electrical lines to the furnace and cause power that would feed a fire to shut off.   (*Id*. at 164-65).

In response to that testimony, Richard Hutchison, one of Consolidated's Presidents, testified in the

Welbilt Litigation that Consolidated even ran studies to determine if this was true and concluded that

losing the source of electricity did not extinguish the fires once they started.  (TX 122 at 12-13).  The

Trustee testified that he feared testimony like this showing knowledge on the part of Consolidated

and Welbilt and callous indifference to the defects could cause a jury to award substantial punitive

damages.  (3/27/08 Tr. at 165).

       40.     The Trustee testified that he also had concerns about whether he could even advance

the argument that the Furnaces were not defective given the position he successfully took in his

lawsuit against Welbilt that the Furnaces were defective.  (*Id.* at 163-64).  In the Welbilt Litigation,

the Trustee asserted in both the trial court and on appeal that the Furnaces were defective and that

Consolidated's Furnace-related liabilities were substantial and rendered Consolidated insolvent.

(Bankr. Ct. Doc. 611, 621; *Freeland v. Enodis Corp.*, 4:04-cv-0064, Doc. No. 15).

       41.     As a result of the evidence presented by the Trustee in the Welbilt Litigation, the

Bankruptcy Court made the following findings with respect to the Furnaces:

While Welbilt struggled with its 1988 LBO debt, Consolidated struggled with problems of its own. Defects with its horizontal furnaces began to emerge. PX 66; Tr.Vol. 2 at 103. Welbilt was aware of these problems but continued to take all the money from Consolidated. Welbilt took approximately $14 million of Consolidated's cash in 1989 and 1990, and forced Consolidated to borrow $7 million from Tippecanoe County in order to the buy the equipment it needed to manufacture the new furnaces which would replace the older line. PXs 78-79; DX 137; Tr.Vol. 2 at 61-62. Problems continued, and in March, 1990, North Carolina's Attorney General began investigating the problems with the horizontal furnaces and concluded that they were defective and that compensation was warranted. Tr.Vol. 2 at 108-09; PX 217-1. This problem extended beyond North Carolina and in 1992 expert engineers concluded that the heat exchangers in those furnaces needed to be redesigned. PX 596; Tr. Vol. 22 at 23-29.

In 1993, more problems emerged. The Consumer Product Safety Commission (CPSC) got involved and investigated a vent collar defect in Consolidated's furnaces. DX 425; Tr. Vols. 2 at 167; 12 at 194. During this investigation CPSC also became aware of the exchanger problem with the furnaces and more investigations began. Tr.Vol. 18 at 90. Shortly thereafter, a group of consumers in California was threatening a class action law suit -- the Salah Class Action Suit. Tr.Vols. 2 at 162-67; 12 at 14-17. As the failure rate of the heat exchangers increased, Consolidated's customers incurred large warranty expenses and looked to Consolidated for reimbursement. PX 218-2; Tr.Vol. 2 at 148-51.

*Freeland v. Enodis*, 99-4022, Decision and Proposed Findings of Fact and Conclusions of Law at 4-6 (July 28, 2004) (Bankr. Ct. Doc. 622), *aff'd*, *Freeland v. Enodis*, 04cv0064, 2006 U.S. Dist. LEXIS 79620 (N.D. Ind. October 31, 2006). The Bankruptcy Court concluded that these Furnace-related claims were "so numerous, so potentially expensive and so severe that—even after being discounted for their contingent nature—they were sufficient to render Consolidated insolvent." *Id.* at 19.

17

42.     The Trustee and Mr. Crabtree both testified that the Settlement Class would likely rely upon the evidence presented by the Trustee in the Welbilt Litigation. (3/27/08 Tr. at 137, 163-164; *see also* TX 137). The Trustee testified that given the evidence presented by his counsel in the Welbilt Litigation he was "not sure that [he] could have ethically contested liability." (*Id.* at 163).

43.     With respect to the amount of damages, Mr. Richardson testified that, based upon his investigation of Consolidated's manufacturing records there are approximately 1,000,000 Furnaces that would be covered by the State Court Action. (*Id*. at 57-58). The State Court Action covers all of Consolidated's Furnaces except those sold in certain parts of California that contained a NOx rod. (*Id*. at 54). The NOx rod was a device inserted into the Furnace to lower its nitrous oxide emissions. (*Id*. at 82-83). This device was only sold in those areas of California that had more stringent air quality requirements for appliances. (*Id*. at 193). Consolidated's liability for defects in the NOx rod furnaces was settled as part of the *Salah* class action litigation. (*Id*. at 54). Mr. Richardson testified that of the approximately 794,000 "H" series Furnaces manufactured by Consolidated between 1983 and 1995, only approximately 140,000 contained NOx rods. (*Id*. at 57; TX 179). An approximately 300,000 additional non-NOx rod Furnaces were sold between 1980 and 1983 and after 1996. (3/27/08 Tr. at 57-58).

44.     Mr. Richardson testified that the defects in the Furnaces caused potential fire damage and carbon monoxide poisoning and that it was necessary to inspect and replace defective Furnaces. (*Id*. at 59-65). In addition, the Settlement Class claims that flame rollover in the Furnaces has caused charring of the plywood on which the "H" series Furnaces are placed. (*Id*. at 153). Mr. Richardson testified that the cost of inspections is estimated to be $200 per Furnace and that replacement costs are conservatively estimated at $1,500 to $2,000 per Furnace. (*Id*. at 65-66). On the basis of these

18

estimates and the number of Furnaces, Mr. Richardson concluded that damages could be in excess of $2 billion. (*Id*. at 66). Counsel for the Settlement Class, John Crabtree, testified that they would present evidence related to the "H" series Furnaces that damages were $2.35 billion. (*Id*. at 138-40; TX 137at C240112).

45. Mr. Richardson further testified that in his opinion the range of reasonable litigation outcomes was that the Settlement Class would be awarded a claim against Consolidated between tens of millions and hundreds of millions of dollars. (3/27/08 Tr. at 52) ("My view of reasonable probably outcomes would be tens of millions on the low end and hundreds of millions, if not higher, on the high end.").

46. The Trustee also testified that the likely range of litigation outcomes was from the low tens of millions to the upper hundreds of millions. (*Id.* at 165-166). He explained that out of the universe of a million furnaces, if even 50,000 need to have the furnaces replaced at $2,000 per furnace, that this would amount to $100 million in damages. (*Id.*). The Trustee concluded that he did not think anything less than a $30,000,000 litigation outcome was possible. (*Id.* at 166-67).

47. Mr. Richardson testified that there was a significant question whether any insurance coverage was available for these damages because Consolidated's insurance policies had a "products exclusion" which excluded coverage for the cost to replace the Furnaces. (*Id*. at 63-64). Mr. Richardson testified that what the Insurers contributed to the Settlement was at the "very, very upper bounds" of what could have been expected from the Insurers given that the Insurers had very good basis for denying coverage under Indiana law and that most of the claims were for the cost of replacing Furnaces which were not covered in any event. (*Id*. at 69). The Trustee also testified that

19

he believed that there was "no way" the Insurers would have contributed more to the Settlement. (*Id*. at 170).

48.     Both Mr. Richardson and the Trustee also testified to several advantages to the estate from the Settlement.  (*Id*. at 58-59, 68-70, 129-30, 163-176).  First, the Settlement Class will encompass all of Consolidated's Furnaces and, with the exception of opt-outs, will bring an end to litigation over Consolidated's Furnace-related liabilities.  (*Id*.).  Concluding the Furnace-related litigation will allow the Trustee to conclude administration of the Consolidated chapter 7 case once the Welbilt Litigation is resolved and allow him to pay creditors more quickly than if the State Court Action continued.  (*Id*. at 172-175).  Absent a settlement, Mr. Crabtree estimated that the State Court Action and related litigation could last another ten to fifteen years.  (*Id*. at 140).  The Trustee testified that if the Settlement were not approved, he would have to wait to close the Consolidated bankruptcy estate until the State Court Action and any associated appeals were resolved because the United States Trustee's Office will not allow chapter 7 trustees to make partial distributions to creditors before a case is finally closed.  (*Id*. at 173-74).  Therefore, absent this Settlement, the bankruptcy estate would be held open pending the final resolution of the State Court Action.

49.     Second, the Settlement will likely resolve litigation with the Insurers over the coverage provided by Consolidated's insurance policies.  (*Id*. at 169).  The Trustee has already lost this litigation and is currently appealing an adverse ruling.  The expected cost of concluding those appeals is estimated to be $70,000 to $90,000 and the Trustee will avoid those costs if the Settlement is approved.  (*Id*. at 170).

50.     Third, the Settlement avoids the risks that the Insurers will stop funding defense costs. The Insurers have paid the costs of defense to date, but given the adverse rulings against the estate regarding coverage they might attempt to stop funding those costs.

51.     Fourth, the release provisions found in the Settlement for Distributors should allow the Trustee to resolve the indemnification claims filed against the estate by Consolidated's Distributors.  (*Id*. at 175).  Mr. Richardson testified that the Distributors have filed claims in the "tens of millions of dollars" and that the Settlement will allow Distributors that do not opt-out of the Settlement to resolve their claims against Consolidated and ultimately remove their claims from the bankruptcy case.  (*Id*. at 65).  These release provisions are the reason Bard withdrew its objection to the Settlement.  (*Id.* at 6-9).  In addition to Bard's claim of $11.25 million, significant other large Distributor claims remain unresolved, including: Amana ($10.835 million); Goodman Air Conditioning ($6.685 million); and The Trane Company & American Standard ($18.5 million). (TXs 169).  Thus, the Settlement makes it more likely that these claims may be resolved on favorable terms.

52.     Fifth, under the Settlement, the Trustee will receive an assignment of the alter ego claims held by Settlement Class members.  (3/27/08 Tr. at 173; *see also* TX 1 at § 13.3).  The Trustee testified that holding these claims would enhance the Trustee's ability to resolve his litigation against Welbilt.  (3/27/08 Tr. at 172-73).  Currently, the Seventh Circuit is considering as part of the appeals before it whether to remand the Trustee's alter ego claims against Welbilt for trial. If the Seventh Circuit does remand those claims for trial, holding the claims of the Furnace-related creditors for alter ego liability would allow the Trustee to offer Welbilt enhanced protection in any settlement and make settlement of the Welbilt Litigation more likely.  (*Id*.).

21

53.     Robinson & Cole's objection to the settlement focused on four points—(1) that the non-NOx rod Furnaces are not defective or that any problems were related to installation errors and not due to design problems and therefore the Trustee should easily be able to defeat the Settlement Class's claims, (2) that the State Court would not certify a nationwide class,  (3) the *cy pres* provisions of the Settlement are unfair, and (4) that the Settlement Class was too broadly defined because it included "G" series and other Furnaces besides the "H" series Furnaces.  Robinson & Cole also suggested that the Trustee should have been able to settle with the Settlement Class on the same terms as the *Salah* settlement.

54.     To support these positions, Robinson & Cole offered the testimony of Eric Daniels who testified that liability in the State Court Action could be easily defended and that the defense would cost only $250,000 to $300,000.  (3/28/08 Tr. at 202).

55.     Mr. Daniels' testimony was not convincing for a number of reasons.  First, unlike Mr. Richardson who had spent thousands of hours investigating the issues and defending against the claims raised in the State Court Action, Mr. Daniels had no current knowledge about the case. Although Mr. Daniels has represented Welbilt and its subsidiaries since 1992 in products liability matters, Mr. Daniels last performed any legal work related to Consolidated and its furnaces in July, 1998, just a few months after the State Court Action was filed.  (*Id*. at 206, 252-53; TX 168).  Mr. Daniels admitted that between July 1998 when he last performed work for Consolidated and the hearing on the Motion, he had spent less than ten hours "trying to educate [him]self and understand the trustee's proposed settlement."  (*Id*. at 206).  He further testified that the only documents he reviewed to give his testimony were what he described as "claims summaries" that he had prepared many years ago about cases pending against Consolidated at that time and that he did not review any

materials specific to the claims made by the Settlement Class in the State Court Action. (*Id*. at 207). Mr. Daniels further acknowledged that he did not review any of the documents produced by the Trustee in connection with the instant Motion or even review the trial exhibits presented at the hearing on the Motion. (*Id*. at 213-14, 258).

56.     Second, Mr. Daniels' conclusion that the State Court Action could be easily defended appeared to be based upon a mistaken belief that the evidence related to the defects in the Furnaces applied only to the NOx rod furnaces. (*Id*. at 197-99). Mr. Daniels had no support for this assertion other than his claim that he believed his "claims summaries" showed this to be the case. (*Id*. at 198-99). Mr. Daniels conceded that his testimony was very limited, stating that "the only thing I'm testifying to is as a practical matter, there were very few claims ever presented involving non NOx Rod furnaces." (*Id*. at 225-26). Rather than review the actual record in the State Court Action and assess the evidence, Mr. Daniels appears to be asking the Court to draw the conclusion that because his claims summaries allegedly showed very few claims based upon non-NOx Rod Furnaces, the Trustee should therefore be able to prevail in the State Court Action. But the leap from his testimony to the conclusions Mr. Daniels asks the Court to draw is too far of a leap for the Court to make. Mr. Daniels did not offer his claims summaries into evidence or even identify by case name and time period the claims that appeared in those "case summaries." Thus there is no means to test the accuracy of his statements or whether the summaries were a complete listing of all claims. (3/28/08 Tr. at 207, 211-12). Mr. Daniels acknowledged this lack of corroboration when he testified under cross-examination that he did not "think that Attorney Werling had any intention of using those as exhibits at the hearing. They're not being offered as exhibits at the hearing." (Id. at 211-12). Even Mr. Daniels conceded that he did not know what types of Furnaces were involved in the cases listed

23

in his "case summaries" and that he based his conclusion that the cases primarily involved NOx rod Furnaces solely on whether the case was filed in California.  (3/28/08 Tr. at 194-96).  ("[I] put those that arose from California in the so called NOx Rod basket, and the others in the non NOx Rod basket, so it is admittedly not a hundred percent reliable.")

57.     More importantly, there is no credible basis in the record to conclude that only NOx rod Furnaces were defective.  The Bankruptcy Court did not limit its findings to the NOx rod Furnaces—in fact much of its discussion about Consolidated's Furnace-related liabilities focused upon Furnaces sold in North Carolina and other states, where it is clear Consolidated sold only non-NOx rod Furnaces.  *See Freeland v. Enodis*, 99-4022, Decision and Proposed Findings of Fact and Conclusions of Law at 4-6 (July 28, 2004) (Bankr. Ct. Doc. 622), *aff'd*, *Freeland v. Enodis*, 04cv0064, 2006 U.S. Dist. LEXIS 79620 (N.D. Ind. October 31, 2006).  The Arthur D. Little report which concluded that the Furnaces were defective did not limit its findings to NOx rod Furnaces. (TX 23).  Mr. Richardson's testimony about his investigation of the Furnaces and his conclusion that a jury would likely find the Furnaces defective was not limited to the NOx rod Furnaces.  (3/27/08 Tr. at 59).  Finally, the expert testimony developed by the Settlement Class related to the non-NOx rod Furnaces.  (*Id*. at 136; TX 137).  Mr. Daniels offered no testimony to counter this evidence.  (*See generally* 3/28/08 Tr.)

58.     Third, Mr. Daniels has an obvious bias.  His client Welbilt is adverse to the Trustee in this matter.  Mr. Daniels testified that he expects Welbilt to pay for his time in testifying at the hearing on the Motion.  (3/28/08 Tr. at 262).  Welbilt also paid for Robinson & Cole's legal representation at the hearing on the Motion and Mr. Daniels considers Welbilt to be one of his most important clients.  (*Id*. at 219-221; 260-264; TX 4).

59.     Fourth, Mr. Daniels' opinions about the likelihood of defeating the Settlement Class

Claim is suspect because he claimed to have never seen key documents such as the Arthur D. Little

report or know of key facts such as the problems with the Furnaces in North Carolina. (3/28/08 Tr.

at 226-230).  Mr. Daniels also claimed to have no knowledge about what Consolidated's employees

would testify about the Furnaces if the State Court Action proceeded to trial.  (*Id*. at 257-58).  His

alleged lack of knowledge about these key facts and the evidence renders Mr. Daniel's opinions

about the merits of the State Court Action questionable at best.

60.     Mr. Daniels' assertion that any problems with the non-NOx rod Furnaces were related

to installer errors was equally unpersuasive.  Again, Robinson & Cole provided no support for this

position.  Mr. Richardson testified that Consolidated's Furnaces failed at a higher rate than the

furnaces manufactured by competitors making it unlikely that the problems were caused solely by

installers.  (3/27/08 Tr. at 71).  In addition, Mr. Richardson testified that a product can be found to

be defective if it is intolerant to reasonably anticipated installation errors.  (*Id*. at 71-72).  According

to Mr. Richardson, Consolidated's employees would testify that the Furnaces were not tolerant to

installation errors.  (*Id*. at 72).  Mr. Richardson also noted that even if as much as 50% of the liability

was attributed to installers, Consolidated would still face liability for the remaining damages because

parties are jointly and severally liable in products liability cases.  Thus, even under those

circumstances, the Settlement Class could still choose to pursue Consolidated and the estate for the

full amount of any liability.  (*Id*. at 72-73).

61.     In addition to the fact that Mr. Daniels' testimony about the likelihood of defeating

liability was not persuasive, Robinson & Cole's positions on certification of a nationwide class and

the *cy pres* provisions of the Settlement also were not supported.   As both Mr. Richardson and

Mr. Crabtree testified, even if Consolidated were able to defeat nationwide class certification, the Settlement Class would simply refile their claims in multiple states, seeking state-wide certification. (3/27/08 Tr. at 66-68, 141-42).   Mr. Richardson testified that the attorneys involved for the Settlement Class had taken this approach in other cases and he believed that they had the wherewithal to do so here.  (*Id*. at 67).  Mr. Crabtree confirmed that he and his co-counsel would follow that approach.  (*Id*. at 141-42).  Both the Trustee and Mr. Richardson testified that defeating nationwide certification and forcing the Settlement Class to sue in multiple states would not be advantageous to the bankruptcy estate and that from the estate's perspective it was preferable to defend against one lawsuit.  (*Id*. at 68; 167-68).  Finally, Mr. Richardson testified that in his opinion, the only reason why the Insurers contributed to the Settlement at all was because it was a settlement of all of the possible furnace claims through the vehicle of a nation-wide class and thus, if they contributed, the Insurers could "close their files down and be done with it."  (*Id*. at 58-59).

62.   With respect to the *cy pres* provisions of the Settlement, Robinson & Cole's complaint appears to be that the firm does not like the provision and that the Trustee should have insisted it be eliminated from the Settlement.  Mr. Crabtree testified that he would not agree to eliminate this provision and considers it an important part of the Settlement.  (*Id*. at 144-46). Mr. Richardson testified that he and the Trustee "tried, frankly, for five years or more to negotiate a deal that [did not contain *cy pres*]" … And despite my best efforts and despite probably I guess it was seven formal sessions, and we tried at every turn to get it back, and they wouldn't agree to it." (*Id*. at 129).  Mr. Crabtree further testified that it may be unlikely that there is any *cy pres* money particularly given that the Trustee is unlikely to pay the Settlement Class's Proof of Claim in full absent a favorable ruling on the estate's alter ego claims against Welbilt.  (*Id*. at 148-150).  ("We

know that under any scenario we are not going to give everybody their relief, because we would run out of money before we ever got close to it.") (*Id.* at 148).  But if the Trustee were to be able to pay the Settlement Class Proof of Claim in full, Robinson & Cole's claim also would have to be paid in full as well because both claims are of the same priority.   In such a circumstance, Robinson & Cole would have no legitimate basis to complain about the *cy pres* provision.  (*Id.* at 176).  Finally, Mr. Richardson testified that including the *cy pres* provision is beneficial to the non-Settlement Class creditors of the estate such as Robinson & Cole because it makes it more likely that the State  Court will approve the Settlement when it is presented to the State Court at the final fairness hearing.  (*Id*. at 129-30).

63.     Finally, Robinson & Cole's objection to the breadth of the Settlement Class is without merit because as Mr. Crabtree testified, the inclusion of the "G" series and other non-"H" series Furnaces into the Settlement Class "was insignificant as far as settlement amounts go, inconsequential."  (3/27/08 Tr. at 141.)  Absent the Settlement, the plaintiffs in the State Court Action intended to assert damage claims of over $2.35 billion related to the "H" series Furnaces alone.  (*Id*. at 139-140; TX 137).  Thus, compromising the "H" series Furnace claims along with any other Furnace-related claims that may exist against Consolidated for a tiny fraction of that amount—$51.8 million—clearly did not inflate the settlement amount and provides only a benefit to the bankruptcy estate by allowing the estate to conclude all possible litigation over its Furnaces.

64.     Robinson & Cole did not present any evidence about the reasonable range of litigation possibilities.   Instead, Mr. Daniels testified that he believed the Trustee should use any funds recovered on account of the Welbilt judgment to try the State Court Action should the Insurers elect to stop funding defense costs, and he testified that he expected the Trustee would prevail.  (3/28/08

Tr. at 197-205). Mr. Daniels did not contemplate any other result other than total victory and thus his testimony was not persuasive.

65. Finally, Robinson & Cole's suggestion that the Settlement should have been the same as the *Salah* class action settlement has no merit. According to Robinson & Cole because the *Salah* Class agreed to release its proof of claim and accept a settlement payment only from the Insurers and Welbilt, the Settlement Class here should do the same. (3/28/08 Tr. at 204-05). Robinson & Cole, however, presented no evidence to show the comparability of the two settlement negotiations. (*See generally* 3/28/08 Tr.) The Trustee testified that when the *Salah* settlement was negotiated, that case was just one week from a trial date and the estate had no money and had not yet obtained a judgment against Welbilt. (3/27/08 Tr. at 170-71). Thus, the Trustee had nothing to contribute to the *Salah* settlement at the time of those negotiations. (*Id.* at 171). That was not the case when the instant settlement was negotiated. Moreover, it is important to note that Welbilt had to contribute cash to supplement the Insurer's payments to the *Salah* class. (*Id.* at 171).

## III. Conclusions of Law

66. Federal Rule of Bankruptcy Procedure 9019(a) authorizes this Court, after a hearing on appropriate notice, to approve a compromise or a settlement of a claim so long as "the settlement is in the best interests of the estate." *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007); *In re Andreuccetti*, 975 F.2d 413, 421 (7th Cir. 1992); *In re Energy Co-op, Inc.*, 886 F.2d 921, 926-27 (7th Cir. 1989).

67. The seminal case on the question of whether a settlement is in the best interests of the estate in this Circuit is the *Energy Co-op* decision. In *Energy Co-op*, the Seventh Circuit held that "[c]entral to the bankruptcy judge's determination [of whether a settlement is in the best

28

interests of the estate] is a comparison of settlement's terms with the litigation's probable costs and probable benefits.  Among the factors the bankruptcy judge should consider in his analysis are the litigation's probability of success, the litigation's complexity, and the litigation's attendant expense, inconvenience, and delay (including the possibility that disapproving the settlement will cause wasting of assets)."  886 F.2d at 927 (quoting *In re American Reserve Corp.,* 841 F.2d 159, 161 (7th Cir. 1987)).

68.     In undertaking this analysis, this Court is not required to make a precise mathematical determination that "what the estate gives up by virtue of the settlement *must* equal what the estate receives by virtue of the settlement."  886 F.2d at 928 (emphasis in original).  As the Seventh Circuit put it, "[t]he world of settlements … does not read like a balance sheet—nor should it.  Assigning value to contested claims cannot be done with the same precision as assigning value to a bill for the receipts of goods."  *Id.*  Nor is this Court required to try the underlying case and determine who would have prevailed.  *Id.*

69.     Noting that the burden of litigation does not fall evenly in any case and that other factors such as a litigant's ability to finance litigation and the cost of delay may influence the decision to settle, the Seventh Circuit explained that "[c]ourts thus do not require the use of rigid mathematical formula to set dollar values on disputed claims because to do so 'would create an illusion of certainty where none exists and place an impracticable burden on the whole … [settlement] process.'… Rather, the job of the reviewing court is to determine whether the 'value of the proposed compromise distribution is reasonably equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved."  *Id.* at 928-29.  "The test for reasonable equivalence is 'whether or not the terms of the proposed compromise fall

29

within the reasonable range of litigation possibilities. . . . A challenged settlement fails this test only

if it falls below the lowest point in the range of reasonableness.'"  *Id.* at 929; *accord Doctors'*

*Hospital*, 474 F.3d at 426 (quoting *Energy Co-op*).

70.     The Settlement satisfies the standards for approval set forth in *Energy Co-op* and its

progeny.  The Settlement involves the compromise of a $1 billion claim for $51.8 million—of which

the Insurers will pay $4.8 million and the estate will pay some portion of the balance through the

allowance of a general unsecured claim.  The settlement amount is about 5% of the damages sought,

representing a very substantial compromise of the Settlement Class's Claim and making the

Settlement one which is in the estate's best interests.

71.     The Trustee has properly considered each of the factors set forth in the controlling

case law, including the merits of the Settlement Class Proof of Claim and the State Court Action and

the likelihood of defeating the Settlement Class Proof of Claim and the State Court Action, the delay,

expense and inconvenience of continued litigation and other benefits from the Settlement. Allowance

of a proof of claim in the amount of $47 million and a total settlement of $51.8 million falls within

the range of reasonable litigation possibilities and is in fact at the low end of possible outcomes.

72.     On the basis of the evidence presented, the Settlement amount is fair, reasonable and

adequate to all creditors including Robinson & Cole and the members of the Settlement Class.  From

the perspective of non-Settlement Class creditors, the Settlement caps liability that could have been

significantly greater and allows the Trustee to close the estate and distribute funds to all parties more

quickly than he would be able to do if he had to wait for the State Court Action and any related

appeals to be concluded.

73.     Similarly, from the Settlement Class's perspective, the Settlement will provide substantial direct relief to class members who chose to participate.  In addition, through the *cy press* provisions of the Settlement Agreement, the Settlement will provide indirect relief to class members who do not directly participate in the Settlement. (3/27/08 Tr. at 144-46).  *Cy pres* relief is important because some class members may not directly participate in the settlement. (*Id*. at 146).  *Cy pres* relief is particularly important in a case like this one, where the subject of the settlement—defective furnaces —pose a serious risk to class members. (*Id*.). Subject to the approval of the State Court, the Trustee's counsel and the class counsel will seek approval to use any residual funds to indirectly serve the interests of class members. (*Id*. at 147).  The State Court, for example, may approve funds to purchase and distribute carbon monoxide detectors in impoverished communities that are less likely to have received settlement notice and may not have directly participated in the Settlement. (*Id*. at 129).  The Settlement also is beneficial to the Settlement Class because it provides relief without additional years of litigation.  In addition, while a larger proof of claim might give class members marginally more relief relative to other estate claimants, whatever additional relief the class might receive would likely be outweighed by additional, lengthy litigation and the delay that litigation would bring.

74.     The Settlement also is in the best interests of the estate because the Trustee's concern that he would not be able to contest liability in the State Court Action is well founded.  Substantial case law exists that the Trustee would be estopped from contesting liability and would be bound by the evidence he presented in the Welbilt Litigation that the Furnaces were defective.  *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749-50, 121 S. Ct. 1808, 149 L.Ed.2d 968 (2001); *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 526 (7th Cir. 1999) ("The doctrine of

31

judicial estoppel is an equitable concept 'provid[ing] that a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground.'") (citing *McNamara v. City of Chicago*, 138 F.3d 1219, 1225 (7th Cir. 1998)).  This risk supports the Trustee's business judgment that the Settlement is reasonable and in the best interests of the estate.

75.     But even without the risk of an estoppel finding, the Trustee presented substantial evidence that there is a very high likelihood of a finding of liability against the estate.  Mr. Daniels' conceded as much when he testified that "the only thing I'm testifying to is as a practical matter, there were very few claims ever presented involving non NOx Rod furnaces."  (3/28/08 Tr. at 225-26).  Given the significant risk of a substantially higher damage award, the Trustee's business judgment to settle is reasonable and in the best interests of the estate.

76.     Robinson & Cole's assertion that the Trustee could defeat certification of a nationwide class and its suggestion that if the Trustee was able to do so, multiple lawsuits would not be filed in other states due to statute of limitations issues is also without merit.  The Trustee's reasoning for preferring one nationwide lawsuit is reasonable.  Further, even if the Trustee were able to defeat nationwide certification, the filing of the State Court Action clearly tolled the limitations period as of December 1997.  *See, e.g., American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).  Thus, counsel for the Settlement Class would have time to file multiple suits against Consolidated in multiple states.  The filing of the bankruptcy petition in May, 1998 also tolled the statute of limitations.  *See* 11 U.S.C. § 108(c); (*See also* 3/27/08 Tr. at 168-69).  Counsel for the Stefanyshyn class have pursued this case since 1997—over 10 years.  (3/27/08 Tr. at 134).  Class counsel has reviewed hundreds of thousands of documents, hired and examined expert witnesses and prepared extensively for trial.  They have shown themselves to be experienced, competent class counsel who

have well represented their class in this complex and lengthy litigation so far and who would prosecute separate state court actions if necessary.  (*Id.* at 135-136).

**IV.     Conclusion:**

Based upon the above proposed findings of fact and conclusions of law and the evidence submitted at the hearing on the Motion, the Court grants the Trustee's Motion to Approve the Settlement (DE 22).  The Court finds that the value of the proposed compromise distribution is reasonably equivalent to the value of the potential claim and that the terms of the proposed compromise fall within the reasonable range of litigation possibilities.

**SO ORDERED on May 28, 2008.**


**_S/ Joseph S. Van Bokkelen_**
**JOSEPH S. VAN BOKKELEN**
**UNITED STATES DISTRICT JUDGE**